UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERRANT GENE THERAPEUTICS, LLC,

                        Plaintiff,

          - against -

SLOAN-KETTERING INSTITUTE
FOR CANCER RESEARCH,

                       Defendant.

**MEMORANDUM
OPINION AND ORDER**

15-CV-2044 (AJN) (RLE)

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

Before this Court are the Parties' cross-motions for entry of a protective order pursuant to Federal Rule of Civil Procedure 26(c). (Doc. Nos. 61 and 62.) While the Parties agree that a protective order is necessary to protect the exchange of information in discovery, they disagree on the scope of the order. Plaintiff Errant Gene Therapeutics ("EGT") seeks: 1) a "Highly Confidential" provision that would apply to "highly sensitive internal research documents," and 2) an "Attorneys' Eyes Only" provision that would apply to information reflecting the identity of any entity with whom the Parties are in business negotiations. (Doc. No 61 at 1-2.) Defendant Sloan-Kettering Institute for Cancer Research ("SKI") seeks a broader designation: an "Attorneys' Eyes Only" provision that applies to discovery containing "proprietary or sensitive personal, research or business information." (Doc. No. 62 at 1.)

The Parties also disagree on the number of people who will have access to information designated "Confidential." EGT requests that confidential information be made accessible to three executives. (Doc. No. 61 at 3.) SKI seeks to limit disclosure to two in-house counsel and

two additional officers or employees of either party. (Doc. No. 62 at 1.) For the reasons that follow, both motions are **GRANTED in part,** and **DENIED in part.**

## II. BACKGROUND

EGT, a company that developed a treatment for sickle-cell anemia and thalassemia, known as the vector, brings this breach of contract action against SKI. (Doc. No. 61 at 2.) EGT alleges that SKI fraudulently induced EGT into an agreement to purchase the vector, promising to commercialize it and share the proceeds. (*See generally* Complaint at Doc. No. 1.) SKI contends that it has invested significant resources in vector product development with the expectation that its related research and business dealings would be kept confidential. (Doc. No. 62 at 1.) SKI proposes to apply an "Attorneys' Eyes Only" provision to "proprietary or sensitive personal, research or business information" in the hopes that it will prevent EGT from benefitting from its product development. (*Id.* at 1-2.) This includes: (1) clinical studies and scientific research; (2) valuable business practices and strategies that are not generally known and for which reasonable efforts are undertaken to preserve their confidentiality, such as trade secrets; and (3) sensitive personnel information. (Doc. No. 62 at 4-5.) The document requests by EGT that SKI takes issue with include: (1) documents discussing, concerning or referencing companies in the biotechnology industry; (2) documents concerning SKI's efforts to treat patients with the vector; (3) documents concerning SKI's efforts to commercialize the vector; and (4) documents of SKI's efforts to recruit patients for clinical trials with the vector. (Doc. No. 63 at Exhibit ("Ex") 1.)

Despite EGT's arguments to the contrary, SKI maintains that its research material would be beneficial to EGT in developing another product or a modified version of the vector. SKI consistently points to a *New York Times* article in which EGT's CEO, Pat Girondi ("Girondi"),

2

explains that he is "raising money to make more of the therapy and treat more patients." (Doc. No. 53-2 at 6.) SKI interprets that statement to mean that EGT is trying to develop and commercialize another vector and treat patients at another hospital. (Doc. No. 62 at 2.) SKI also argues that without an "Attorneys' Eyes Only" provision, the vector project could suffer harm if EGT improperly uses SKI's research, leading to development delays, compromising product safety and efficacy, and/or derailing the SKI project completely. (*Id.*) SKI believes that EGT could gain an "unwarranted market advantage" with knowledge of SKI's unpublished research and clinical-trial process. (*Id.* at 7.) Through this access to SKI's information, SKI posits that EGT could use the information to advance its own research and clinical trials. (*Id.*)

EGT argues that the Parties have been collaborators in the development and commercialization of the vector, and there is no articulable reason why it should not have access to the information it seeks from SKI. (Doc. No. 61 at 2.) According to EGT, it is "already privy to research material concerning the vector." (Doc. No. 70 at 2.) In any event, EGT contends that it has already agreed that "highly sensitive research materials" can only be viewed in the offices of SKI's outside counsel, and no further restrictions are necessary to address SKI's concerns. (*Id.* at 1.)

With respect to harm to its business dealings, SKI contends that third-party companies will be hesitant to engage in out-licensing transactions for the vector. It explains that the purpose of developing the vector was to secure an out-licensing transaction with a pharmaceutical company. (Doc. No. 62 at 6.) Such companies "conduct due diligence to learn who has received access to the data, research, and product information." (*Id.* at 2.) SKI is concerned that granting EGT employees access to such information will turn away prospective licensees if they perceive a risk of being harassed by EGT or being drawn into litigation. (*Id.*) SKI additionally expresses

3

concern about access to information from Memorial Sloan Kettering Cancer Center's ("MSK"), of which SKI is a unit. (*Id.*)

The Parties also dispute the number of business people who will have access to the information marked "Confidential." According to SKI, its proposal will permit EGT's "independent experts and six outside lawyers" to view "Attorneys' Eyes Only" information. Additionally, two employees will have access to any materials marked confidential, which SKI argues is more than sufficient. (*Id.* at 3.) EGT has agreed to limit the number of individuals who can see "confidential" information to three: 1) Girondi; 2) Sam Salman ("Salman"), President; and (3) Jason Feldman ("Feldman"), Director of Business Operations. (Doc. No. 61 at 3.) EGT maintains that these three executives possess the knowledge and experience to determine whether SKI's documents support the claim that SKI has been working towards the commercialization of the Vector. (*Id.*)

### III. DISCUSSION

#### A. Applicable Law

A party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). Rule 26(c)(1) authorizes courts, for good cause shown, to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). "The party seeking a protective order has the burden of demonstrating that good cause exists for issuance of the order." *Uniroyal Chem. Co. v. Syngenta Crop Prot.*, 224 F.R.D. 53, 56 (D. Conn. 2004) (internal citations omitted); *see also Dove v. Atlantic Capital Corp.*, 963 F.2d 15, 19 (2d Cir. 1992) (citations omitted). More than "[b]road allegations of harm unsubstantiated by specific examples or articulated reasoning," good cause requires "the moving

4

party [to] demonstrate that 'disclosure will work a clearly defined and very serious injury.'" *Uniroyal Chem. Co.*, 224 F.R.D. at 56 (internal citations omitted).

There are a number of ways in which courts may enter a protective order, including forbidding the disclosure or discovery sought, prescribing a discovery method other than the one selected by a party, or designating the persons who may be present while the discovery is conducted. FED. R. CIV. P. 26(c)(A), (C), (E). Courts may also require that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way. FED. R. CIV. P. 26(c)(G).

"Whether information merits protection in a particular case depends upon: 1) the extent to which the information is known outside the business; 2) the extent to which information is known to those inside the business; 3) the measures taken to guard the secrecy of the information; and 4) the value of the information to the business and its competitors." *Uniroyal Chem. Co.*, 224 F.R.D. at 56-57. Protective orders limiting access to highly confidential information to counsel and experts "are commonly entered in litigation involving trade secrets and other confidential research, development, or commercial information." *Vesta Corset Co., Inc. v. Carmen Foundations, Inc.*, No. 97-CV-6139 (WHP), 1999 WL 13257, at *3 (S.D.N.Y. Jan 13, 1999) (internal citations omitted).

"Where a party seeks a protective order restricting the scope of discovery of technical, proprietary information, the court should balance . . . 'the interests in full disclosure of relevant information and reasonable protection from economic injury.' Relevant considerations in striking this balance include: 1) whether the person receiving the confidential information is involved in competitive decision making or scientific research relating to the subject matter of the patent, 2) the risk of inadvertent disclosure of proprietary information, 3) the hardship

5

imposed by the restriction, 4) the timing of the remedy and, 5) the scope of the remedy." *Uniroyal Chem. Corp.*, 224 F.R.D. at 57 (internal citations omitted). "The competing interests to be evaluated in determining the outcome of such a dispute are one party's right to broad discovery and the other party's ability to protect its confidential materials from misuse by competitors." *Medimmune, Inc. v. Centocor, Inc.*, 271 F. Supp. 2d 762 (D. Md. 2003) (internal citations omitted).

**B.    Research and Development Material is Properly Restricted**

Although the Parties do not appear to be direct competitors, SKI's proposal to designate as highly confidential research, development, and commercial information is consistent with the protections afforded under Rule 26(c). SKI seeks to restrict clinical studies, scientific research, business practices and strategies, and sensitive personnel information to "Attorneys' Eyes Only." It argues that the disclosure of SKI and MSK information will cause injury and risk of misuse, which in turn could harm vector development. (Doc. No. 62 at 5.) What SKI seeks to protect is not as broad as EGT suggests. SKI does not vaguely designate "any sensitive document," as EGT states (Doc. No. 61 at 1), but rather describes what types of documents would be considered highly confidential.

While EGT contends that the Parties were collaborators in vector development, and not competitors, the very nature of the Parties' relationship in this litigation is adversarial. Prior to dismissal of its replevin cause of action, EGT sought an order requiring SKI to allow EGT to treat patients in clinical trials, which is what SKI purportedly failed to do for a period of twenty-one months. (Doc. No. 16 at 2-20.) In its Complaint, EGT demanded reversion of right in the vector, as well as intellectual property and clinical trial results. (*Id.* at 20.) The logical conclusion to be drawn from such a demand is that EGT seeks return of the vector to develop

6

and commercialize it. SKI's argument that EGT could gain unwarranted market advantage through disclosure of unpublished research and clinical trial information is therefore plausible. It is equally plausible that prospective licensees would be wary of engaging in an out-licensing transaction if a potential competitor such as EGT was known to have access to development and proprietary information. *See Tailored Lighting, Inc. v. Osram Sylvania Products, Inc.*, 236 F.R.D. 146, 148 (W.D.N.Y. 2006) ("Recognizing the sensitive nature of proprietary technical information, courts generally afford more protection to it than to ordinary business information"); *Sullivan Marketing, Inc. v. Valassis Communications, Inc.*, No. 93-CV-6350 (PKL), 1994 WL 177795, at *2 (S.D.N.Y. May 5, 1994) (finding that knowledge of the defendant's marketing plans would give its competitors an unwarranted advantage in the market).

Such risks must therefore be balanced against the risk of disclosure and the hardship EGT may suffer with an "Attorneys' Eyes Only" designation. EGT has agreed to designate as confidential the names of entities with whom SKI is in business negotiations. (Doc. No. 70 at 4.) This solution, however, does not seem to protect against misuse or improper disclosure. According to SKI, Girondi has made assurances that he will not disclose confidential information to employees who are not direct participants in competitive decision-making, product design, or research. (Doc. No. 62 at 8.) Given EGT's repeated representations that it seeks to do the same thing it contracted with SKI to do with the vector, the Court is not convinced that Girondi's assurances are sufficient. In a *New York Times* article dated October 15, 2015, Girondi was quoted as saying that he was raising money to make more therapy and treat more patients. (Doc. No. 53-2 at 7.) SKI reportedly indicated it would not stop his endeavors, so long as he does not use SKI's "money, property orpersonnel [*sic*]." (*Id.*) EGT points out that Girondi has spent

7

years working on the development of the Vector. (Doc. No. 61 at 3.) Girondi's ambitions in developing the vector directly contradicts providing him with unfettered access to information regarding SKI's business dealings, clinical trials, or personnel information.

It follows that Girondi would be intimately involved in competitive decision-making. EGT's president, Salaman, also holds a position as CEO of an investment firm that deals in the biotechnology and pharmaceutical sectors. (Doc. No. 72 at 3.) EGT does not dispute this assertion. Because of Girondi and Salaman's roles in competitive decision-making, the inadvertent risk of disclosure warrants a more restrictive designation for document production as proposed by SKI. *See Koninklijke Philips N.V. v. iGuzzini Lighting USA, Ltd.*, 311 F.R.D. 80, 83 (S.D.N.Y. 2015) ("[T]he competitive decisionmaker analysis hinges on the risk of *inadvertent* disclosure, because it is difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so") (citing *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010)) (emphasis in the original) (internal quotations omitted).

Nor does EGT dispute that its experts and six lawyers will have access to the information under SKI's "Attorneys' Eyes Only" designation. *Tailored Lighting,* 236 F.R.D. at 148 ("[I]n cases involving the disclosure of trade secrets, courts often issue protective orders limiting access to the most sensitive information to counsel and their experts") (collecting cases). SKI's need to protect research materials and business information outweighs the hardship EGT will suffer if the disclosure is limited to attorneys and experts for both Parties.

## C. EGT's Proposal to Limit to Three Employees for Disclosure of Confidential Information is Sufficient

SKI has not shown good cause for limiting disclosure of confidential information to two in-house counsel and two employees of each party, as opposed to EGT's proposal of three

employees. SKI merely argues that an expansion from two to three employees will "only increase the risk of misuse." (Doc. No. 62 at 10.) SKI has not specified, based on the three names provided by EGT, which executive it would seek to limit. The Court agrees with EGT that SKI does not seem to care which two individuals see the information designated confidential.

EGT identified Girondi, Salman, and Feldman as executive employees who should have access to confidential information. EGT argues that these individuals have knowledge and experience to determine whether SKI's documents support its claims that it has worked to commercialize the Vector. (Doc. No. 61 at 3.) SKI has not provided a compelling reason to outweigh the prejudice EGT will suffer if the executives are prevented from accessing information. While these employees will not have access to information designated "Attorneys' Eyes Only," the Court finds that they are properly within the scope of what SKI contemplates as confidential information.

## IV. CONCLUSION

The Parties are **HEREBY ORDERED** to conduct discovery in manner consistent with this opinion. The clerk of court is directed to close Doc. No. 52 and 54.

SO ORDERED this 2nd day of September 2016.
New York, New York

The Honorable Ronald L. Ellis
United States Magistrate Judge

9