USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/16/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERRANT GENE THERAPEUTICS, LLC,

                Plaintiff,

- against -

SLOAN-KETTERING INSTITUTE FOR CANCER RESEARCH,

                Defendant.

OPINION AND ORDER
15-CV-2044 (AJN) (RLE)

RONALD L. ELLIS, U.S.M.J.:

## I. INTRODUCTION

On June 5, 2017, the Court issued an Opinion and Order granting Defendant Sloan-Kettering Institute for Cancer Research's ("SKI") motion for sanctions against Plaintiff Errant Gene Therapeutics, LLC ("EGT") for using and disclosing protected discovery in Illinois and New York State actions. (Doc. No. 149.) SKI filed a letter motion on June 16, 2017, asking the Court to issue an Order to Show Cause why EGT should not be held in contempt of Court for continuing to prosecute the New York action. (Doc. No. 150.) The Court held a contempt hearing on June 27, 2017. Because EGT has established an independent factual basis for its allegations, the Court **DENIES** SKI's request.

## II. BACKGROUND

Because this Court has addressed the facts of this matter in previous Opinions, the following summary assumes that the reader is familiar with this case.

### A. Procedural History

On March 18, 2015, Plaintiff Errant Gene Therapeutics, LLC initiated this action by filing a Complaint against Sloan-Kettering Institute for Cancer Research. (Doc. No. 1.) The

Parties negotiated a protective order and submitted briefs on the scope of discovery to be categorized as "Attorney Eyes Only" ("AEO") and the number of people who would have access to information designated as "Confidential." (Doc. Nos. 52-54, 61-64, 66, 70, 72.) On June 2, 2016, the Court held oral argument on these issues and ruled that SKI's proposed protective order, (Doc. No. 53-1), would operate as the Parties' interim Protective Order until a final order was issued by the Court. (Doc. No. 58.) The interim Protective Order contained the provision:

> ...Confidential and Attorneys' Eyes Only information shall be used by the Receiving Party solely for the purposes of preparation for trial, pretrial proceedings, and trial of actions and proceedings in the above-captioned action and not for any business, commercial, regulatory, competitive, personal or any other action.

(Doc. No. 53-1 at ¶ 8(1).) The Court issued an Opinion and Order adopting SKI's proposed scope of the "Attorneys' Eyes Only" designation to include highly confidential research, development, and commercial information. (Doc. No. 77 at 6-8.) In addition, the Court adopted EGT's proposal to limit disclosure of confidential informational to three employees. (*Id.* at 8-9.) The Court directed the Parties "to conduct discovery in [a] manner consistent with the opinion." (*Id.* at 9.) The Parties never filed a fully-executed amended protective order to replace the interim Protective Order and the Parties continued to be bound by the terms of the interim Protective Order.

On November 3, 2016, SKI filed a motion for sanctions alleging that EGT had violated the interim Protective Order through filing a complaint against it and Bluebird Bio, Inc. ("Bluebird") in the Circuit Court of Cook County, Illinois, using information learned in discovery that was designated AEO and Confidential. (Doc. No. 102.)

On February 8, 2017, SKI filed a second motion for sanctions and asked that EGT be held in contempt of Court. (Doc. No. 136.) SKI alleged that EGT had again violated the interim Protective Order by using and disclosing protected information to file another complaint in New

2

York State Supreme Court ("New York Complaint"). (*Id.*) EGT argued that the allegations containing the confidential information are "wholly supported by an independent factual basis," and submitted a declaration by Patrick Girondi, its CEO, attesting how he had determined his allegations in the complaint against SKI. (Doc. No. 141 at 2.)

The Court issued an Opinion and Order on June 5, 2016, granting SKI's motions for sanctions and denying its motion to hold EGT in contempt of Court. In its opinion, the Court established the burden EGT would be required to meet to bring allegations that otherwise might be improperly derived from AEO and Confidential documents. The Court stated that EGT would have to "demonstrate[e] that Girondi 'relied solely upon an independently-developed factual basis to support its New York complaint." (Doc. No. 149 at 9-10.) The factual basis for Girondi's allegations would have to be verifiable through independent information. (*Id.*)

While declining SKI's request to compel EGT to dismiss its New York action, the Court noted that "because EGT must refrain from further misuse of the AEO and Confidential information obtained in this case, continuing to prosecute the New York action while avoiding further violation of this action's Protective Order would be impractical if not impossible." (*Id.*)

On July 16, 2017, SKI filed a letter claiming that EGT had violated the protective order again by 1) filing an amended complaint in the New York action [hereinafter "Amended New York Complaint"] that SKI believed relied on AEO and Confidential documents, and 2) making discovery demands of SKI to produce the protected documents at issue here. (Doc. No. 150.) SKI asked the Court for an Order to Show Cause why EGT and its counsel "should not i) be held in contempt of Court for continuing to violate the Court's Protective Order and the Court's [June 5, 2016] order, and ii) be required to dismiss its New York action."

3

EGT replied on June 16, 2017, stating that it "relied solely upon [an] independently-developed factual basis to support the amended complaint, including independently verifiable information to substantiate the claims." (Doc. No. 152.) In support of its position, EGT directed the Court to "four items of correspondence sent by Mr. Girondi to the Board of SKI in 2012 and 2013 in which Plaintiff makes the exact same claims against SKI and Bluebird that are made in the amended State court complaint." (*Id.*)

The Court held a contempt hearing on June 27, 2017, at which Girondi testified. EGT was instructed "to address either by documenta[tion] and/or by testimony, how [its] independent determination came about." (Transcript of Contempt Hearing ["Tr."] at 4.) SKI had an opportunity to cross-examine Girondi. The Parties provided an oral summation to the Court and have submitted post-hearing briefs and letters. (Doc. Nos. 161-63, 165-67, 172).

**B. Testimony at Contempt Hearing and Supporting Documentation**

At the hearing, Girondi testified that on February 5, 2012, he read a New York Times article reporting that Craig B. Thompson, the CEO of SKI, was being sued for intellectual property theft. (Tr. at 25-27.) (Pl.'s Ex. 2.) The article reported that Thompson's former employer, the Leonard and Madlyn Abramson Family Cancer Research Institute at the University of Pennsylvania, accused Thompson of "walk[ing] away with groundbreaking research… and us[ing] it to help start a valuable biotechnical company," Agios Pharamceuticals. *See* Andrew Pollack, Sloan-Kettering Chief is Accused of Taking Research, N. Y. Times, Feb. 5, 2012, *available at* http://www.nytimes.com/2012/02/06/health/cancer-center-in-lawsuit-says-a-doctor-appropriated-a-discovery.html. Girondi also testified to having read another article about Thompson being accused of taking research from September 1, 2012. (Tr. at 27) (Pl's Ex. 3.) Girondi testified that after seeing the articles, he emailed Mortimer Zuckerman, a board member

4

of SKI on November 3, 2012. (Tr. at 28; Pl.'s Ex. 1 at Ex. H). In the email, which is an exhibit to the Amended New York Complaint, Girondi told Zuckerman that Thompson had just received $133 million from Bluebird for his company, Agios Pharmaceuticals, and that Bluebird had just abandoned their Vector. (Tr. at 28; Pl.'s Ex. 1 at H) Girondi's email stated "it seems to be the ending of a bad film" because "the best product for patients was being shelved." (*Id.*)

Girondi testified that a few days later on November 6, 2012, he sent an email to Zuckerman because the Wall Street Journal had published an article about Thalassemia, which had mentioned Bluebird but had failed to mention SKI. (Tr. at 29.) Girondi's email stated that "things at SKI are falling behind and that too many consequences point to conflicts of interest between your head [the CEO of SKI, Thompson] and Third Rock Partners."[1] (Pl.'s Ex. 1 at Ex. H.) Girondi's email also demanded an emergency meeting. (Pl.'s Ex. 1 at Ex. H.)

When asked whether at this time in November 2012 he was "concerned about a conspiracy to damage the EGT Vector," Girondi testified that he was, and that he was specifically concerned that "Thompson and Third Rock Partners, who are closely affiliated were going to destroy my project so that Bluebird's inferior vector could go ahead." (Tr. at 30.)

Girondi also testified that a February 2009 letter from EGT's president, Sam Salman, to the board of SKI conveyed EGT's position that "there [was] a huge problem of conflict of interest between the CEO of Sloan-Kettering and our only competitor, Bluebird Bio." (Tr. at 30-31.) (Pl.'s Ex. 1 at Ex. J). This letter raises at least two relevant concerns to the Court's inquiry: (1) a potential conflict of interest for SKI's CEO, Craig Thompson, because of his financial interest in Agios Pharmaceuticals and the fact that Agios was being financed by one of EGT's potential commercialization partners. EGT believed that the financing of Agios provided greater

---

[1] During his testimony, Girondi identified Third Rock Partners as the owners of Bluebird. (Tr. at 29.)

"incentive" than the potential "renumerations" that could be obtained through SKI's activities in partnership with EGT. EGT cautioned that this conflict could potentially bear on efforts to commercialize the vector and maintain confidentiality; and 2) that there was no "transparent mechanism...for EGT to be privy to the...commercialization strategies and activities" of SKI. (Pl.'s Ex. 1 at Ex. J). These concerns directly relate to SKI's good faith business relationship with EGT and EGT's goal to commercialize the vector.

Girondi testified to writing a letter to Zuckerman on February 28, 2012, stating that "there can only be one winner in the orphan drug designation race." (Tr. at 31.) (Pl.'s Ex. 1 at Ex. K.) In this letter, Girondi states that he "believe[s] that the lost year can be attributed to questionable behavior" and that he "believe[s] SKI and EGT are both victims of [Craig Thompson, Third Rock, and Bluebird's] greed." (Tr. at 32.) (Pl.'s Ex. 1 at Ex. K.)

In 2014, Scott Clarke, the head of licensing for a company named Biomarin, approached Girondi because Biomarin was interested in buying the Vector. (Tr. at. 35.) However, Clarke told Girondi that they were having "trouble" with SKI that was reportedly due to "contract issues." (Tr. at 35.) Girondi testified that upon learning this he contacted Eric Cottington, the head of research at SKI, who assured him that there were no contract issues between EGT and SKI. (Tr. at 35-36.) Girondi testified that in October 2014, Clarke informed Girondi that SKI had told him there was a "lien on the patent." (Tr. at 36.) Later, in December of 2014, Clarke informed Girondi that SKI had told him that "there was some kind of option maybe" and that SKI had been "acting...cagey." (*Id.*) Clarke also told Girondi that Biomarin would not proceed with commercialization of the Vector if SKI kept the project. (*Id.*)

Girondi testified that around this time, he met with Eric Cottington and was "disturbed" by the fact that SKI had not treated the fourth patient with the Vector. (Tr. at 37.) He further

testified that Cottington told him that SKI had "no more money for the project"… [a]nd that they knew they had to give the project back to [EGT], eventually, but it was the last thing they wanted to do." (*Id.*)

Girondi also testified that two other companies were interested in collaborating with EGT to commercialize the Vector, but that efforts to move forward stalled when SKI was unwilling to collaborate. (Tr. at 38 and 39.)

Through two news articles, Girondi learned that a company named Celgene made a significant purchase of shares of Juno, another company that was owned by the University of Washington and SKI. (Tr. at 45-46); *see* (Pl.'s Ex. 6). According to Girondi, soon after purchasing Juno shares, Celgene canceled an agreement with Bluebird for "Car T cells". (Tr. at 45.) Girondi testified that, in his opinion, this was a pay off wherin "Thompson promised to shelf [the Vector] so that Bluebird could go ahead with their product and Juno and Agios could go ahead with Car T cells," which, according to Giondi, would benefit Third Rock Partners. (Tr. at 45-46.)

Girondi also testified about how he learned of the agreement between Bluebird and SKI. (Tr. at 48 and 49.) Girondi said that the attorneys sent him the motion to quash the subpoena to depose Nick Leschly, CEO of Third Rock.

> "And I read in like page two, the third line, where it said that it basically was of no—it wasn't EGT's business why they made a deal with Sloan-Kettering. That's the first time I ever knew that Bluebird had made a real deal with Memorial Sloan-Kettering. So my competitor made a deal with my partner."

(Tr. at 48.)

When Girondi was asked "did [he] ever come to the conclusion that there was a conspiracy to shelf the EGT vector?" Girondi testified "as my letters to the board demonstrate" that he started to fear that there was a conspiracy between Bluebird and SKI in 2012. (Tr. at 49.)

7

On cross-examination, Girondi testified that when he initially filed the federal suit, it had been for replevin. (Tr. at 59.) When he was asked whether there had been any allegations concerning the potential conflict of interest between Thompson and Bluebird, Girondi stated "it was hearsay."

### III. DISCUSSION

**A. EGT has fulfilled its burden of demonstrating that it had an independently-developed factual basis for its allegations.**

EGT alleges in its Amended New York Complaint that SKI and Bluebird conspired against EGT to wrest control of the vector away from it. (Pl.'s Ex. 1.) According to SKI, EGT is using information that it learned exclusively from AEO and Confidential documents to make these allegations in violation of the protective order.[2] (Doc. No. 161 at 5-17).

EGT has alleged that "in September 2010 a conspiracy commenced to illegally halt clinical trials of the EGT Vector, to take possession of EGT's technology, eliminate Bluebird's competition and eliminate the threat to the investments of Thompson's partners in Agios." According to SKI, only the protected information could provide the date of the agreement between Bluebird and SKI, and a conspiracy allegation "requires knowledge of the date(s) of the agreement(s) between SKI and Bluebird (in relation to the June 2011 agreement)." (Doc. No. 161 at 9-10.) The Court disagrees that only the protected documents could support EGT's allegations. A review of the circumstantial evidence available to Girondi permits a reasonable deduction of the relative start date of the alleged conspiracy.

---

[2] The Court notes that despite explicit instruction to do so, SKI did not provide the documents on which it alleges EGT improperly relied for its allegations. (Tr. at 86-87, 96.) Nevertheless the Court is able to assess whether EGT's witness, Patrick Girondi, along with its documentary evidence, independently sustain the allegations in the Amended New York Complaint. Further, the Court has received additional briefing from the Parties on de-designating the documents at issue, which it has also considered.

8

In support of its position that EGT actually relied on protected documents to make its allegations, SKI points to EGT's previous attempts to bring these allegations and argues that Girondi lacks credibility. According to SKI, EGT's own language in its Proposed Second Amended Complaint acknowledges that the allegations are derived from protected discovery materials:

> "Discovery has revealed that in the fall of 2010, SKI and Bluebird entered into a secret partnership for the purpose of wresting the right to the EGT Vector from EGT and ceding them to Bluebird. EGT did not know and could not have discovered such secret dealings until the recent production of documents in this lawsuit."

Proposed Second Amended Complaint, attached to September 30, 2016 Letter to Judge Ellis from K. Sussmane, ¶ 50 ("Proposed SAC). SKI argues that the similarity of the allegations in the Proposed SAC to the allegations in the Amended New York Complaint is evidence of EGT's reliance on protected documents to make its allegations. (Doc. No. 161 at 8-10.) SKI's conclusion, however, leaves no room for external circumstantial evidence that could reasonably cause EGT to arrive at the same conclusion without having access to protected information. For this reason, the Court does not adopt SKI's theory that the similarities in the complaints necessitate a violation of the protective order.

SKI also argues that EGT must have relied on protected information rather than making its pleadings from Girondi's "imagination" because New York's state rules bar representations made with a "legally insufficient factual basis." (Doc. No. 161 at 12.) The CPLR and the New York State Rules of Court require that a party certifying a document before a New York court conducts a "reasonable inquiry" that the contents of that document are not frivolous. *See* N.Y. Ct. R. § 130-1.1-a. Thus, with sufficient circumstantial evidence, EGT could reasonably allege that SKI and Bluebird formed a conspiracy against it. *But see Robinson v. Robinson*, 303 A.D.2d 234, 235 (1st Dep't 2003) ("…the court is not required to accept factual allegations that are

9

plainly contradicted by the documentary evidence or legal conclusions that are unsupportable based upon the undisputed facts"). In any case, whether EGT has sufficient factual information to sustain its Amended New York Complaint is a question for the state court to decide.

With regard to the instant matter, the burden placed on EGT is to show that the allegations are derived from an independently developed factual basis that can also be independently verified. If EGT can show that its allegations, regardless of their legal soundness, are derived from a source other than the protected documents at issue here, then it will have met its burden.

After reviewing the testimony and supporting documents, the Court determines that EGT has presented sufficient circumstantial evidence to support its position that it did not rely on protected information. Girondi testified at length about his increasing concerns about a potential conflict of interest between the CEO of SKI and his competitor Bluebird. (Tr. at 24-50). In support of his testimony, Girondi supplied letters to the Court that he or other executives of EGT wrote to the board of SKI dating back to 2012. (Pl.'s Ex. 1 at Ex. H, I, J, K). The letters plainly state EGT's concerns regarding a conflict of interest. (*Id.*) In addition, Girondi supplied news articles from 2012 that detail allegations against Craig Thompson, claiming that he stole intellectual property from his former employer for his own business endeavors. (Pl.'s Ex. at 2, 3.) The Court finds that Girondi could reasonably conclude that SKI and Bluebird had conspired against EGT when taken in light of the fact that Girondi had learned from various sources that 1) SKI was not treating patients with the Vector, 2) SKI had no funding for the project but was resistant to turning it over to EGT, and 3) SKI had refused to collaborate with several different companies who wanted to buy the vector to commercialize it. (Tr. at 37-38.)

While SKI argues that the fact that "EGT itself created a number of the documents on which it relies [is] the antithesis of the 'independently verifiable information' required to show independent development" (Doc. No. 161 at 15), the Court finds that because the letters and emails from Girondi and other individuals at EGT were 1) sent prior to the filing of the New York Complaint, and 2) received by board members and/or employees of SKI, they are independently verifiable.

SKI also asks the Court to conclude from the fact that the documentary evidence was created before the filing of the federal lawsuit, that EGT would not have been able to bring its conspiracy allegations without the protected information. (Doc. No. 161 at 13.) SKI points out that even though EGT had this same information at the time that it filed its federal complaint, the original federal complaint did not have conspiracy claims, thus EGT must have relied on protected information to make its conspiracy allegations. (*Id.*) It is plausible to the Court, however, that though Girondi believed he had circumstantial evidence of a conspiracy between Bluebird and SKI, he may not have believed he had sufficient evidence to plead these claims. The Court agrees that Third Rock's confirmation of an actual agreement between SKI and Bluebird in the motion to quash could reasonably move Girondi's very strong suspicions into allegations that he believed were legally actionable, even if, through litigation it is shown to be unsustainable.

SKI argues that because Girondi testified that he had not read the complaints that EGT's counsel is therefore responsible for using protected information to file the Amended New York Complaint. (Doc. No. 161 at 11-12). However, Girondi's testimony demonstrates that he had independently developed a conviction as to how SKI and Bluebird had conspired against him,

and regardless of whether Girondi was engaged in the actual crafting of the New York complaints, EGT's counsel acted upon Girondi's understanding of the facts.

Thus, the Court finds that EGT has met its burden of establishing an independent factual basis for its claims in the Amended New York Complaint.

**B. Girondi is a credible witness for the limited inquiry before the Court**

Defendant SKI raises many challenges to Girondi's credibility. (Doc. No. 161 at 11-17.) SKI argues that Girondi was "lying" either when he testified and denied having seen either the initial or Amended New York Complaints or less than a month prior to the hearing when he verified the pleadings by swearing before EGT's counsel that he read the contents of the Complaint. (Doc. No. 161 at 12 and 14.) The Court appreciates the contradiction pointed out by SKI. This contradiction, however, does not undermine the credibility of Girondi's testimony about whether he had a reason to believe that SKI and EGT had conspired against him. Given the fiduciary relationship between a client and its counsel, the Court does not find that this contradiction rises to the level of finding Girondi not credible with respect to the development of the factual basis for his allegations.

SKI also draws the Court's attention to Exhibit H of the Amended New York Complaint, an email from Girondi to an SKI board member that refers to "Agios having raised $133 million in funding." (Pl.'s Ex. 1 at Ex. H.) SKI argues that this email contradicts Girondi's testimony in which he said "the CEO of Memorial Sloan-Kettering had received $133 million from our competitor Bluebird Bio." (Tr. 28 at 17-19.) Specifically, SKI argues that Girondi "was no longer able to tell the differences (i) between Agios raising funds and moneys being paid to Dr. Thompson, or (ii) between Agios and Bluebird." (Doc. No. 161 at 15.) The Court disagrees that the email and testimony are in conflict. First, the full sentence from the email is "Our, Your

CEOs', Agios Pharama has received 133 million in raises assisted by the owners of our chief competitor Bluebird who has just abandoned their vector for a new one." (Pl.'s Ex. 1 at Ex. H.) The Court finds the plain meaning of this sentence to be consistent with Girondi's testimony: that the CEO of SKI, Craig Thompson, has a company, Agios Pharmaceuticals, which raised money with assistance from owners of Bluebird. (*See* Tr. at 28.)

SKI also asks the Court to conclude from Agios Pharmaceutical Inc.'s publically available SEC filings, which Girondi testified to having read, that Thompson was not a "significant shareholder" of Agios because he is not listed as a stockholder. SKI has provided an excerpt of Agios Pharamceutical, Inc.'s S-1 Registration Statement filed with the Securities and Exhange Commission on June 10, 2013. (Declaration of Charles A. Weiss in Support of Defendant Sloan-Kettering Institute for Cancer Research's Post-hearing brief in support of application to hold plaintiff in contempt and for sanctions, Doc. No. 160 at 1 and Ex. 1.)[3] EGT argues that SKI's submission of an excerpt of Agios's SEC filings fails to provide an accurate reflection of Thompson's relationship with Agios. (Doc. No. 162 at 15.) The Court agrees. On pages that SKI left out of its exhibit, the Form S1 and its exhibits indicate that Thompson is a founder of Agios, was a member of its Scientific Advisory Board, and signed the Investor Rights Agreement as a founding member of the company.[4] (Doc. No. 163, Ex. 8 at 6-30.)

The significant role and/or interest of Thompson in Agios is further supported by a newspaper article from 2012 that Girondi testified to having read. (Tr. at 25-26.) (Pl. Ex. 2.)("And Dr. Thompson's lawyer said that he would ask the court to dismiss the case, which also names as defendants the company that Dr. Thompson started, Agios Pharamaceuticals....") Even

---

[3] While these documents were not entered into evidence at the hearing, the Court will consider them because EGT has had an opportunity to respond and admit documents in support of its position. (Doc. Nos. 161-162.)
[4] The Court also notes that by failing to produce the full document and arguing that Thompson was not a significant shareholder, SKI has made a misrepresentation to the Court in potential violation of its duty of candor to the Court.

13

though, as SKI points out, the article also reported that as of 2012 "Agios [was] privately owned and has not disclosed how much stock Dr. Thompson owns...," (Pl's Ex. 2, at 4,) the fact that Thompson was reported to be a founder and could possibly have stock in the company lends itself to a reasonable inference that Thompson has a close relationship with Agios which could create potential conflicts of interest when viewed in the totality of the circumstances. The Court, therefore, finds it reasonable that Girondi would refer to Thompson and Agios interchangeably in this context, given that Girondi had read reliable documents stating that Thompson was a founder of Agios.

The Court also disagrees that Girondi is unable to tell the difference between Bluebird and Agios Pharma or Third Rock Partners. SKI has not alleged any statements from Girondi that indicate that he confused Bluebird and Agios. In fact, Girondi's statements consistently indicate that Bluebird or Third Rock Partners had raised the $133 million *for* Agios. While SKI cites Girondi's testimony that "Agios Pharma received upward of 133 raise from Third Rock Partners" to infer that Girondi has confused Bluebird with Third Rock, Girondi also testified that Third Rock was the owner of Bluebird. (Tr. at 29.) Girondi's use of Third Rock and Bluebird interchangeably, therefore, is not evidence of his lack of credibility given that as a layman, he has reasonably described the close relationships, dynamics, and potential conflicts between these companies.

At the hearing, Girondi testified that his former counsel, David Burger, had told him that in another lawsuit, Thompson had "lied three times under oath, and couldn't remember one testimony to the next." (Tr. at 58:6-13.) Girondi testified that Burger did "multiple interrogations" of Thompson. (Tr. at 58:23-59:4) SKI points out, however, that no discovery,

14

including depositions, took place in those cases.[5] (Doc. No. 161 at 12, FN 8.) EGT takes issue with SKI's attempt to impeach Girondi through SKI's attorney "offer[ing] himself as an unsworn witness to defend Dr. Thompson's performance in a lawsuit..., [and] citing unseen dockets and an alleged conversation with an unnamed attorney who actually represented Dr. Thompson." The Court agrees that SKI's counsel has improperly relied on information from unsworn sources. However, upon reviewing the public dockets of these cases, which were undisputed by EGT, the Court concludes that these cases settled before progressing to the discovery phase. While the inaccuracy of the testimony could weigh against Girondi's reliability, the Court does not have enough evidence to contradict Girondi's statement that this is what he was told by Burger, and thus, that this information helped form his opinion about Thompson.

SKI also argues that Girondi's testimony regarding the scientific publication that is attached as Exhibit F of the Amended New York Complaint is further evidence of his lack of credibility. (Doc. No. 161 at 16-17.) Girondi originally testified that the publication reports an "astounding success" of the clinical trials with patients. (32:9-33:21.) On cross-examination, however, Girondi conceded that the publication did not report on the findings of a clinical trial, or "putting the cells into patients." (Doc. No. 161 at 17; (Tr. at 63:2-7)

SKI also argues that Girondi's "great confidence" in testifying to how the Orphan Drug law's provisions regarding exclusivity operate should weigh against finding him credible given that his explanation is inaccurate. (Doc. No. 161 at 17.) EGT disagrees and maintains that "[o]ther than rare exceptions, Mr. Girondi's legal analysis is correct." (Doc. No. 162 at 9.) The

---

[5] *The Leonard and Madlyn Abramson Family Cancer Research Institute at the Abramson Cancer Center of the University of Pennsylvania v. Thompson et al*, 11 Civ. 9108 (NRB) (filed Dec. 13 2011) and *Trustees of the University of Pennsylvania v. Thompson et al*, No. 12 Civ. 1330 (NRB) (S.D.N.Y. filed Feb. 22, 2012). In its response, EGT did not refute that these cases were the cases to which Girondi referred.

15

Court does not find it necessary to determine the correct interpretation of the Orphan Drug Law's exclusivity provision, but rather weighs Girondi's interpretation of it.

It appears that with respect to Girondi's testimony regarding the scientific publication and the Oprhan Drug law, Girondi has related his own factual misunderstandings to the Court. While Girondi's testimony may indicate that he has drawn conclusions and made decisions without investigating the accuracy of his information, this tendency supports a conclusion that Mr. Girondi could take the bits of information about Thompson's alleged conflicts of interest and create a narrative that EGT conspired against him.

The merits of the EGT's allegations are not before this Court. Whether these claims can survive a dispositive motion or trial on the merits will be determined in the New York state court proceeding. This Court, however, is tasked with determining whether Girondi can make his allegations based on information available to him from independently obtained sources outside of the protected discovery produced in this case. The Court finds that Girondi's conviction in his testimony to his understanding of the Orphan Drug Law and his understanding of the scientific publication support his credibility for the limited inquiry that is presently before the Court. The question before the Court is not whether Girondi is an accurate witness, that is, were his conclusions true; but whether he was an honest witness, that is, did he actually draw the conclusions he testified to. Although Girondi appeared to have a tendency to think the worst of SKI, and this may have affected his interpretation of facts, he was consistent in believing that SKI and others were seeking to undermine the development of the vector.

In consideration of the above, the Court, therefore, finds Girondi to be a credible witness in describing his road to the allegations in the Amended New York Complaint.

### C. EGT did not violate the Court's July 5 Order

The Court has found that EGT had an independently-developed factual basis for its allegations which were supported with independently-verifiable documents. Unlike the prior two sanctions orders, here EGT has overcome the presumption that it improperly used protected material in another action because it attached its independently-verifiable documents as exhibits to the Amended New York State Complaint. Given that the Amended New York Complaint did not rely on protected information, EGT was not required to request permission from the Court to amend the complaint.

### IV. CONCLUSION

EGT has met its burden of proving it has an independently-developed factual basis for its allegations in the Amended New York Complaint. Therefore, it is **HEREBY ORDERED** that SKI's motion to hold EGT in contempt of Court is **DENIED.**

**SO ORDERED this 16th day of October 2017.**
New York, New York

*(signature)*
The Honorable Ronald L. Ellis
United States Magistrate Judge